| | |
|---|---|
| TOD ALAN HENNINGSEN, | CIVIL NO. 11-2693 (PJS/JSM) |
|       Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | |
|       Defendant. | |

The matter is before this Court on cross-motions for summary judgment. [Docket Nos. 15 and 19]. This Court has jurisdiction of the matter pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that Plaintiff's Motion for Summary Judgment [Docket No. 15] be **DENIED** and that Defendant's Motion for Summary Judgment [Docket No. 19] be **GRANTED**.

## I.    PROCEDURAL BACKGROUND

Henningsen applied for benefits on January 29, 2009, alleging an onset of disability of August 30, 2008, as a result of depression, back problems, carpel tunnel in both of his wrists, tendinitis in both shoulders, swollen ankles, pain in his hips, blood disorders requiring blood thinners, high blood pressure, chronic pain, and attention deficit, hyperactivity disorder. (Tr. 156-170, 201). Henningsen was last insured for disability benefits on January 31, 2009. (Tr. 112). Henningsen's claims were initially

denied on March 16, 2009, (Tr. 64-70), and again on reconsideration on May 27, 2009. (Tr. 74-75). Henningsen requested a hearing on July 6, 2009, pursuant to 20 C.F.R. §§ 404.929 et. seq. and 416.1429 et. seq. (Tr. 11, 78-80). A hearing was held before George Gaffney, an Administrative Law Judge ("ALJ"), on May 12, 2010. (Tr. 11, 995-1091). Henningsen was represented by counsel at the hearing. (Id.). Juletta Harren,[1] a vocational expert ("VE"), Henningsen and Henningsen's mother, Joan Henningsen, testified at the hearing. (Tr. 11, 1017-1021).

On June 29, 2010, the ALJ issued his decision denying benefits. (Tr. 11-19). On July 12, 2010, Henningsen sought further review of the ALJ's decision by the Appeals Council. (Tr. 5-7). The Appeals Council denied Henningsen's request for review, making the ALJ's decision final. (Tr. 1-4). See 20 C.F.R. §§ 404.981, 416.1481 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. §§404.981, 416.1481.

Henningsen sought review of the ALJ's decision by filing a Complaint pursuant to 42 U.S.C. §405. [Docket No. 1]. The parties then filed cross-motions for summary judgment. [Docket Nos. 15 and 19].

## II. PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a). The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any

---

[1] Juletta Harren is misidentified as "Ms. Hearn" on the hearing transcript.

substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

## A. Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

**B.    Appeals Council Review**

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982, 416.1467-1482. The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.    Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and to consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of plaintiff's impairments.

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g);

Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory."

Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III. DECISION UNDER REVIEW

### A. The ALJ's Findings of Fact

The ALJ concluded that Henningsen was not under a disability within the meaning of the SSA's regulations from August 30, 2008 to the date of the ALJ's decision—June 29, 2010. (Tr. 17). In support, the ALJ made the following findings:

1. Henningsen met the insured status requirements of the SSA through December 31, 2009. (Tr. 13).

2. Henningsen had not engaged in substantial gainful activity since August 30, 2008, the alleged onset date. (Id.)

3. Henningsen had the following severe impairments: degenerative disc disease and a blood disorder. (Id.)

4. Henningsen did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. (Tr. 14).

5.     Henningsen had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with additional restrictions as follows: he can only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; he can only occasionally tolerate exposure to humidity or wetness, he can never climb on ladders. (Tr. 15).

6.     Henningsen is unable to perform any relevant past work. (Tr. 16).

7.     Henningsen was born on February 21, 1970 and was thirty-eight years old at the time of the alleged onset of his disability, which is defined as a younger individual age 18-49. (Id.).

8.     Henningsen has a limited education and is able to communicate in English. (Id.).

9.     Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Henningsen is "not disabled" whether or not he had transferable job skills. (Id.)

10.    Considering Henningsen's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Henningsen can perform. (Tr. 17).

## B.     The ALJ's Application of the Five-Step Process

The ALJ made the following determinations under the five-step process. At step one, the ALJ found that Henningsen's earnings records supported his allegation that he has not engaged in substantial, gainful activity at any time relevant to the ALJ's decision. (Tr. 13). At step two, the ALJ found that Henningsen was diagnosed with mild, age appropriate lumbar degenerative disc disease in August, 2007, degenerative disc disease of the thoracic spine in December, 2009, and evidence of a blood disorder. (Id.). The ALJ additionally noted that Henningsen had hypertension, a history of pulmonary embolism and hernia surgery.[2] (Id.).

---

[2]     The ALJ further noted Henningsen's history of morbid obesity, for which he underwent gastric bypass surgery in 2009. (Tr. 13, citing Tr. 368, 464). By May, 2009, Henningsen had lost 140 pounds as a result of the surgery. (Tr. 13, citing Tr. 474). The

The ALJ stated that Henningsen had been diagnosed with depression and possible anxiety. (Tr. 13, citing Tr. 368). Because of this evidence of possible mental impairments, the ALJ considered the four broad functional areas described in the disability regulations for evaluating mental disorders, and in Section 12.00(C) of the Listing of Impairments, referenced as the "paragraph B" criteria. (Tr. 13). In the first functional area—activities of daily living—the ALJ found Henningsen had mild limitations. (Id.). The ALJ based this determination on the fact that Henningsen had indicated in March 2009 that he kept himself busy by doing things on his property for his wife and himself, as well as for his parents (who lived next door); he worked on his house and his parents' house; and he kept active with his dogs, attended numerous medical appointments, and shopped. (Tr. 13, citing Tr. 247, 415, 417,).

In the area of social functioning, the ALJ could not find even "moderate" limitations. (Tr. 13-14). The ALJ noted that Henningsen's depression was described as "well-controlled," his thoughts logical and coherent, and he presented in an alert and oriented manner. (Tr. 14, citing Tr. 381, 418). He shopped and kept medical appointments, which showed he could go out in public and tolerate at least superficial interactions with others. (Tr. 14). His mother stated that he had no trouble getting along with family members, neighbors and others, and he got along with authority figures. (Tr. 14, citing Tr. 249, 250).

The ALJ found that Henningsen had mild limitations in the area of concentration, persistence or pace, noting that the record did not suggest that Henningsen had any difficulty with tasks that he enjoyed doing. (Tr. 14). In addition, the ALJ indicated that

_____

ALJ concluded that this medical condition did not present "even minimal limitations to claimant." (Tr. 13).

Henningsen appeared to be of average intelligence and his concentration was described as good. (Tr. 14 citing Tr. 250).

As for the fourth functional area – episodes of decompensation – the ALJ found that there was no evidence of any incident that could be characterized as decompensation which have been of an extended duration. (Tr. 14). For example, Henningsen had never experienced an extended psychiatric hospitalization, been required to leave a work setting due to psychologically-based symptoms, or was unable to leave his home. (Id.).

Because Henningsen's alleged depression and anxiety caused no more than mild limitation in any of the first three functional areas and no episodes of decompensation for an extended duration, the ALJ concluded that these mental impairments are non-severe pursuant to 20 C.F.R. §§404.1520a(d)(1) and 416.920a(d)(1). (Id.). In making this finding, the ALJ noted that Henningsen's depression was described in February 2009 as "marked improved." (Id., citing Tr. 406).

At step three of the analysis, the ALJ acknowledged the severity of Henningsen's disc disease and blood disorder, but concluded that he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Social Security regulations. (Tr. 14-15).

Before considering step four of the analysis, the ALJ determined Henningsen's residual functional capacity ("RFC"): he could perform light work with the additional restrictions that he could only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; only occasionally tolerate exposure to humidity or wetness; and could never climb on ladders. (Tr. 15). In developing this RFC, the ALJ considered the opinions of the State Agency physicians and psychologists, Owen Nelsen, Ph.D., L.P., Gregory

Salmi, M.D,, Russell Ludeke, Ph.D, L.P. and Eames Sandra, M.D., who reviewed the medical records. (Tr. 15, citing Tr. 420-441, 457-459-462). The physicians concluded that Henningsen could work at a light exertional level, but he could not climb ladders, ropes or scaffolds, and could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (Tr. 15, citing Tr. 435-436, 461). The ALJ placed significant weight on these opinions, as they were consistent the record as a whole. (Tr. 15).

The ALJ indicated that he considered Henningsen's significant pain level in determining his RFC. (Id.). Although Henningsen stated in March 2009 that his pain was pretty well controlled, (id., citing Tr. 405), to address his chronic pain, the ALJ included in the RFC weight-lifting restrictions, as well as limitations on balancing, stooping, kneeling, crouching and crawling. (Tr. 15).

The ALJ acknowledged that a psychologist who was treating Henningsen, Amanda Hintz, opined that Henningsen was "disabled from degenerative disk disease in his entire back." (Tr. 15, citing Tr. 416). The ALJ did not place significant weight on this opinion because she was not qualified to render a medical opinion on Henningsen's physical impairments, the record did not support this opinion, and it appeared that Henningsen was the source for this opinion. (Tr. 15).

The ALJ addressed Henningsen's statements that he has experienced complications from his gastric bypass surgery, he went to numerous doctors' appointments, and spent the majority of his life in a recliner chair. (Tr. 15). The ALJ noted that despite Henningsen's subjective complaints of pain, he was able to drive the eighteen-mile round trip to his doctor and there was a lack of medical evidence to support the extreme degree of limitations Henningsen alleged were related to these complications. (Id.).

Also, in exploring Henningsen's subjective complaints of pain, the ALJ indicated that Henningsen's treating physician, Dr. Brian Niskanen, described Henningsen as limited in his ability to perform daily activities. (Tr. 15-16, citing Tr. 536). Again noting that Henningsen was "fairly active," the ALJ determined that this level of activity was inconsistent with Henningsen's claim of disability. (Tr. 16).

The ALJ also considered Henningsen's medical treatment and use of prescription medication. (Tr. 16). The ALJ observed that Henningsen had failed some medical appointments, indicating that his impairments were not as severe as he claimed. (Tr. 16, citing Tr. 364).[3] The ALJ reviewed Henningsen's use of prescribed medications, and determined they were appropriate for his established impairments and that the record did not support a conclusion that they failed to provide Henningsen with relief. (Tr. 16, citing Tr. 381, 383, 384, 389, 547).

Finally, the ALJ considered the written statement of Henningsen's mother. (Tr. 16, citing Tr. 252-259). The ALJ declined to give the statement as much weight as he would give to a medical opinion, and noted that because of the mother-son relationship, she would have incentive to make statements in support of Henningsen's application for benefits. (Tr. 16).

At step four of the evaluation process, the ALJ found that Henningsen lacked the RFC to perform his past work as a construction laborer and logger. (Id.). The VE indicated that these jobs required the ability to perform at the heavy exertional level, which Henningsen could not perform. (Tr. 16, citing Tr. 316-317).

At the fifth step of the analysis, the ALJ determined that Henningsen was "not disabled" within the meaning of the SSA regulations. (Tr. 17). In reaching this

---

[3]    The record cited by the ALJ referred only to one failed appointment. (Tr. 364).

conclusion, the ALJ considered the Henningsen's educational attainment, age, RFC, and work experience as well as the extent to which Henningsen's limitations eroded his ability to perform a full range of light work. (Id.). Relying on the VE's opinion, the ALJ found that Henningsen could perform the jobs of janitor and packager, both of which occupations exist in significant numbers in the national economy. (Id.).

## IV. THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A. Henningsen's Motion for Summary Judgment

Henningsen challenged the ALJ's decision on two grounds. First, he claimed the ALJ's finding at the third step of the sequential evaluation was not based upon substantial evidence because the ALJ failed to fully and fairly develop the record by not having a medical expert at the hearing; by not taking into account Henningsen's pain and depression; and by not giving any weight to the MMPI-2[4] test that was administered to him before his bariatric surgery. Plaintiff's Memorandum ("Pl. Mem."), p. 10 [Docket No. 13]. Specifically, Henningsen argued that the ALJ erred by failing to properly consider whether Henningsen met Listing §12.07 for somatoform disorders when he was clearly preoccupied with the fact that he has a serious back problem. Id., pp. 11-12 [Docket No. 13].

Listing § 12.07 provides as follows:

> 12.07  Somatoform Disorders
>
> Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.
>
> The level of severity for these disorders is met when the requirements of both A and B are satisfied.

---

[4]    MMPI-2 stands for "Minnesota Multiphasic Personality Inventory" exam.  It is a psychological test that is a measure of general emotional and personality functioning.

A.   Medically documented by one of the following:

    1.   A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

    2.   Persistent nonorganic disturbance of one of the following:
       a.   Vision; or
       b.   Speech; or
       c.   Hearing; or
       d.   Use of limb; or
       e.   Movement and its control (e.g. coordination, disturbance, psychogenic seizures, akinesia, dyskinesia; or
       f.   Sensation (e.g. diminished or heightened).

    3.   Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

    And

B.   Resulting in at least two of the following:

    1.   Marked restriction of activities of daily living; or
    2.   Marked difficulties in maintaining social functioning; or
    3.   Marked difficulties in maintaining concentration, persistence, or pace; or
    4.   Repeated episodes of decompensation, each of an extended duration.

Henningsen maintained that it is obvious that he met the criteria of §12.07(A)(3) because of the amount of pain he was experiencing and pain medication he was taking for lumbago (low back pain), for which he has never had back surgery.  Id., pp. 12, 18.

According to Henningsen, this showed he was preoccupied with the fact he had a serious back problem, which was underscored by the MMPI-2 results obtained before he had bariatric surgery.  <u>Id.</u>

As for the criteria under §12.07(B), Henningsen argued that he has marked difficulty maintaining social functioning as evidenced by the fact that he sits in a recliner most of the time, the MMPI-2 showed that he tried to portray himself in a positive light, and his wife's statement in her Third Party Function Report, (Tr. 234-243), that they do not have any friends anymore.  <u>Id.</u>  pp. 12-13.

Henningsen also submitted that his multiple physical problems, taken together, were medically equivalent to the (B)(1) criteria—"marked restrictions of activities of daily living."  <u>Id.</u>, p. 14.  Henningsen admitted that there was no medical source stating as such, but he blamed the ALJ for failing to properly develop the record by neglecting to consult with a medical expert on the issue of medical equivalency.  <u>Id.</u>, pp. 15-17.  As a result, the ALJ's opinion that the combination of Henningsen's impairments did not meet or equal a listing was not supported by substantial evidence in the record.  <u>Id.</u>, p. 18.

Second, Henningsen argued that the RFC assigned by the ALJ was not based upon substantial evidence because the ALJ failed to follow the Commissioner's own regulations regarding the weight to be afforded a treating physician's RFC opinion.  <u>Id.</u>, p. 10.  Henningsen further contended that the ALJ's failure to have a medical expert at the hearing rendered the hypotheticals the ALJ posed to the VE flawed because they did not "comprehensively describe" Henningsen's ability to work.  <u>Id.</u>, pp. 19-20. According to Henningsen, the ALJ should have included in his hypothetical questions to the VE a description of specific limitations consistent with Henningsen's depression and pain.  <u>Id.</u>, p. 20.

As a result of these alleged errors, Henningsen asserted that the case should be remanded for further proceedings. Id., pp.20- 21

**B.      Commissioner's Motion for Summary Judgment**

Contrary to Henningsen's argument that he met the Listing 12.07 for somatoform disorders, the Commissioner argued that Henningsen did not meet the threshold requirements of the Listing.   Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem.") [Docket No. 20] pp. 13-16.  For starters, no medical source ever indicated that Henningsen had the requisite preoccupation or belief that he had a serious medical condition coupled with an unrealistic interpretation of his symptoms, or that Henningsen was taking an excessive amount of pain medication for his back, despite not needing any surgical intervention. Id., pp. 1, 15.

Furthermore, the two state agency reviewing psychologists, Drs. Nelsen and Ludeke, found Henningsen had no severe mental impairments and concluded that he did not meet or medically equal any of the mental listings, including Listing 12.07. Id., p. 15.  Additionally, the record "consistently" showed that Henningsen's depression was well controlled, even by his own admission. Id.

As for Henningsen's reliance on the MMPI-2 to support his theory that even though he appeared happy, he was not, the Commissioner submitted that this test did not show he had an "[u]nrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury." Id. p. 16.  But more significantly, the MMPI-2 results could not defeat the vast amount of evidence in the record that Henningsen's pain and depressive symptoms throughout the relevant time periods were well controlled and that Henningsen was not preoccupied by his back symptoms. Id. p. 16 (citing Tr. 370, 381, 405-17, 415-16, 418-19, 485, 497,

640, 666, 700, 742). In fact, the psychologist who administered and interpreted the MMPI-2 also assessed Henningsen's mental functioning and assigned him a GAF[5] score of 68, indicating only mild symptoms.

Regarding Henningsen's assertion that he met the requirements of Listing 12.07 (B)(1) and (2), the Commissioner contended that the record did not support Henningsen's assertion that he was confined to a recliner all day. Id., p. 17. Rather, the evidence demonstrated that Henningsen was active, helped his parents, kept active with his dogs, did yard work around his house and his parent's house, attended AA meetings and meetings with his probation officer, and after his gastric bypass surgery, was even more active and walking every day. Id.

The Commissioner rejected Henningsen's argument that the ALJ failed to properly develop the record. Id., pp. 17-18. Where the reviewing psychologists found no basis for concluding that Henningsen met Listing 12.07, and no evidence was generated after their review that would have changed their opinions (in fact, it was more of the same), there was no reason for the ALJ to seek further medical testimony on the subject. Id., p. 18 (citing Carlson v. Astrue, 604 F.3d 589, 593, 595 (8th Cir. 2010) (there is no requirement to receive updated medical expert testimony on equivalence where state medical consultant found claimant's condition was not equivalent to a listed impairment)). Moreover, despite Henningsen's insistence that the evidence

---

[5]    "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'" Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir. 2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM-IV")). A GAF score of 61-70 indicates that an individual has some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (occasional truancy or theft within the household), but generally functions pretty well, and has some meaningful interpersonal relationships. DSM-IV, p. 34.

"overwhelmingly" supported a finding that his pain was disproportionate to his diagnosis of lower back pain, he cited no such evidence. Id., p. 18.

The Commissioner also claimed that Henningsen failed to address the evidence that undermined his claims of disability, such as the statements he made that he planned to work after his surgery and that despite his claim for disability benefits, he planned to work. Id., pp. 18-19 (citing Tr. 369-70, 742).

Finally, as to Henningsen's complaint that the ALJ did not properly frame his hypothetical questions to the VE to account for his pain and depression, the Commissioner argued that since the record indicated that Henningsen's pain and depression were well controlled with medication and treatment, Henningsen did not establish that the questions posed to the ALJ did not adequately address Henningsen's actual limitations. Id.. p. 19.

The Commissioner asked the Court to affirm the denial of benefits to Henningsen. Id., p. 20.

## V.   HENNINGSEN'S RELEVANT MEDICAL AND PSYCHOLOGICAL HISTORY[6]

### A.   Medical Evidence

At the time of the ALJ's decision Henningsen was forty years old and had worked as a construction worker and logger. (Tr. 999). Henningsen last worked in 2004, at

---

[6]     This Court will not review the medical evidence relating to Henningsen's blood disorder. Henningsen did not ascribe any error to the ALJ on the basis of this condition. Any claim regarding this impairments is waived. See Craig v. Apfel, 212 F.3d 433, 437 (8th Cir. 2000); see also Yeazel v. Apfel, 148 F.3d 910, 911-12 (8th Cir.1998) (citing Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994) (finding failure to raise an issue before this Court results in waiver of that argument)); Stanek v. Astrue, Civ. No. 10-4870, 2011 WL 6987177 at *1 n. 1. (D. Minn. Dec. 23, 2011) ("The Court need not address arguments that a party failed to raise or discuss in its brief because waiver is 'deemed an abandonment of that issue.' Jasperson v. Purcolator Courier Corp., 765 F.2d 736, 740 (8th Cir.1985); see Hacker v. Barnhart, 459 F.3d 934, 937 n. 2 (8th Cir.2006) (citing Jasperson in determining waiver); see also Mark v. Ault, 498 F.3d 775, 786 (8th Cir.2007) (quoting Hacker, 459 F.3d at 937 n. 2) (holding failure to raise or address an issue constitutes abandonment).

which time he claimed that he was fired for going to too many doctor's appointments. (Id.). At the time of the hearing, Henningsen was taking the following medications: Oxycontin (for pain); Percocet (for pain), Diazepam (muscle relaxant and sleep aid); Citalopram (anti-depressant); Baclosen (muscle relaxant); Warfarin (a blood thinner); and Folic Acid and Vitamin B12 injections (as a result of Henningsen's gastric bypass surgery). (Tr. 314).

Henningsen was required to see a psychologist before his gastric bypass surgery. (Tr. 369). He saw Dr. John Yozwiak at the University of Minnesota Medical Center on October 23, 2008, nearly two months after the alleged onset of his disability. (Id.). During this initial conference, Dr. Yozwiak noted that Henningsen was walking a half-mile to a mile, two to three times per week, in an effort to control his weight. (Id.). Henningsen hoped to lose weight so he could improve his back problems and return to work in approximately six months. (Tr. 370). Henningsen had been addicted to methamphetamine and was convicted for attempting to sell the drug. (Id.). He spent 100 days in jail and then completed outpatient chemical dependency treatment. He was attending Narcotics Anonymous ("NA") and Alcoholics Anonymous ("AA") meetings weekly, and spoke at a treatment center every six weeks. (Id.). Dr. Yozwiak noted that both of Henningsen's parents receive disability for their back problems and Henningsen was assisting with their care. (Id.). Henningsen described his mood to Dr. Yozwiak as "very happy" and that he was feeling better than he had in some time. (Id.).

In connection with this workup, Henningsen took the MMPI-2. (Tr. 370-371). Dr. Yozwiak observed that Henningsen's scores indicated that he may have approached the test defensively, attempting to give the appearance of adequacy, control and effectiveness. (Tr. 371). Even so, Henningsen's scores were elevated in the scales

associated with excessive bodily concern, feeling unhappy and dissatisfied; difficulties in coping with everyday problems; somatic concerns; feeling uncomfortable and not in good health; feeling weak, tired, fatigued, anxious, tense and agitated; a tendency to worry and be fearful; and showing a tendency to feel insecure, inferior, and plagued by self-doubt. (Id.). Further, Dr. Yozwiak noted that Henningsen may be overly concerned with his bodily functioning. (Tr. 371-372). Dr. Yozwiak recommended that Henningsen be re-evaluated in six to eight weeks. (Tr. 372).

At his re-evaluation on November 6, 2008, Dr. Yozwiak noted that Henningsen was feeling overwhelmed and stressed, had been caring for his parents, and alluded to financial difficulties. (Tr. 368).

On November 30, 2008, Henningsen saw Dr. Brian Niskanen, Henningsen's primary care physician. (Tr. 381). Dr. Niskanen noted that Henningsen's depression "actually seems to be well controlled" and that he was feeling better than he had in a long time. In addition, Henningsen's back pain was "controlled." (Id.).

As a result of Dr. Yozwiak's recommendation that he see a therapist, Henningsen began seeing psychologist Amanda Hintz. (Tr. 416). Hintz saw Henningsen on March 4, 2009, and noted that Henningsen told her that there was concern over the results of his MMPI-2, but that it was administered in a cafeteria where people were milling around. (Id.). Because he is easily distracted, Henningsen did not believe that the MMPI-2 accurately measured "where he was at." (Id.). Hintz noted that Henningsen indicated that "is disabled from degenerative disk disease in his entire back," and has been unable to work for the past four years due to this disability. (Id.). Hintz further noted that "[a]t this point, Tod feels actually very good about his life despite the fact that he and his wife may lose their house in foreclosure because of his inability

to work.  He was denied for Social Security and submitted a new claim which hopefully will be approved and allow them to save their home . . . his mood is good . . . he sleeps well, he is probably the happiest he has ever been."  (Id.).

On March 9, 2009, Dr. Niskanen noted that Henningsen said that his chronic pain was "pretty well controlled" and that, in reference to his depression, "this is the best he has felt . . . in some time."  (Tr. 405).  Dr. Niskanen's assessment was that Henningsen's chronic pain was "well controlled," his insomnia was "much improved" and his depression was "markedly improved."  (Tr. 406).

At a follow-up appointment with Hintz on March 27, 2009, Hintz noted that Henningsen presented in good spirits.  (Tr. 415).  He indicated he kept himself busy by doing things on his property and for his parents.  (Id.).  He expressed his continuing worry about money, and his inability to go hunting because of his felony conviction.  (Id.).  Hintz's assessment was that Henningsen was doing "pretty well" emotionally, he was stable on his medication for depression and anxiety, and was a good candidate for the bariatric surgery.  (Id.).

On April 24, 2009, Hintz indicated that Henningsen's gastric bypass surgery was scheduled for May 12, 2009.  (Tr. 742).  She noted that Henningsen stated he hoped he would be able to work after the surgery, and that regardless of whether or not he was awarded disability benefits, "he does want to work some as it gives him a sense of purpose."  (Id.).  He reported that he was working on getting numerous projects completed before his surgery.  (Id.).  Hintz concluded that Henningsen was doing well overall.  (Id.).

Henningsen underwent gastric bypass surgery at the University of Minnesota on May 12, 2009.  (Tr. 547-548).  The surgery and postoperative recovery were

unremarkable. (Tr. 547). On May 21, 2009, Henningsen experienced acute gastrointestinal bleeding and coagulopathy. (Tr. 544-546). Henningsen was seen in the emergency room of the Kanabec Hospital and then transferred to the University of Minnesota Fairview hospital where he was treated for his intestinal bleeding and released. (Tr. 541-543, 745-749).

Henningsen was seen at the University of Minnesota again on August 19, 2009, for a routine nutrition assessment in connection with his gastric bypass surgery. (Tr. 772). Henningsen reported that he was walking five times per week, for thirty to forty-five minutes at a time. (Tr. 772).

Henningsen saw Dr. Thomas Kowalkowski for his back pain on October 1, 2009, and received a steroid injection in his lumbar spine. (Tr. 652-654). Henningsen returned on December 31, 2009. (Tr. 648-651). Henningsen reported a 10% improvement in his thoracic spine since his last visit with Dr. Kowalkowski and a 70% improvement in his pain level in his thoracic spine and 70% improvement in function. (Tr. 638-640). Dr. Kowalkowski noted that Henningsen's MRIs showed evidence of degenerative disc disease at L4-5 with left L5 nerve root involvement. (Tr. 650).

Henningsen visited Dr. Niskanen on December 14, 2009. (Tr. 717). Dr. Niskanen noted that Henningsen's back pain had been worsening,[7] and Henningsen sought a letter from Dr. Niskanen stating that he was disabled. (Id.) Dr. Niskanen stated, "While I believe that he has several medical problems that adversely affect his ability to be gainfully employed, I'm not trained in making disability determinations. I did write a letter summarizing his multiple medical problems." (Id.). That same day,

_____

[7] This statement appeared to have been made based on Henningsen's self-report. (Tr. 717)

Dr. Niskanen wrote a letter "To Whom It May Concern" regarding Henningsen's physical condition, apparently in connection with Henningsen's application for benefits. (Tr. 474).  Dr. Niskanen stated that Henningsen's depression was being managed with medication and was stable; his chronic back pain was being managed with pain medications and epidural steroid injections; he was compliant with the medications; he has taken steps to improve his situation; he has been stable in his recovery from methamphetamine abuse since 2005; he was attending NA and AA meetings weekly; and he was the treasurer of his NA meeting and chair of his AA meeting.  (Id.). Dr. Niskanen, closed by stating "To this point, he hasn't had great improvement with his pain, and continues to be limited in his ability to perform daily activities."  (Id.).

Henningsen underwent a spinal MRI in late December, 2009.  (Tr. 476-499).  The results showed some mild degenerative disc disease at T8-T9, T9-T10 and T11-12 of the thoracic spine and a disc bulge at L4-5 of the lumbar spine.  (Tr. 475).  In reviewing the results, Dr. Niskanen noted that the bulge may be contributing to Henningsen's pain. (Id.).

Henningsen received a nerve block in his thoracic spine and lumbar spine on February 26, 2010.  (Tr. 632-634).  Henningsen rated his pre-procedure pain at 60/100 and post-procedure pain at 40/100.  (Tr. 633, 636).

Henningsen saw Dr. Niskanen for an office visit on March 11, 2010.  (Tr. 666). Dr. Niskanen noted that Henningsen reported an improvement in his thoracic spine pain following his injections and that the pain was "much more bearable."  (Id.). Dr. Niskanen noted that "overall, [Henningsen] appears to be improving."  (Id.).

## B.    State Agency Physicians' Opinions

### 1.    Physical RFC

State Agency reviewing physician Dr. Gregory H. Salmi completed a physical RFC assessment regarding Henningsen on March 14, 2009, and concluded that Henningsen could occasionally lift twenty pounds, frequently lift 10 pounds and stand or walk about six hours in an eight hour work day. (Tr. 434-441).  In addition, Dr. Salmi opined that Henningsen could occasionally climb stairs, balance, stoop, kneel, crouch and crawl but could never claim a ladder, rope or scaffolds.  At the time Dr. Salmi completed his RFC assessment Henningsen had not yet had gastric bypass surgery. (Tr. 435).  Dr. Salmi noted that Henningsen was being treated with pain medication for his back pain with good results and had steroid injections at the L4-5 level, with somewhat lasting results.  (Id.).  Dr. Salmi concluded that due to Henningsen's combination of physical impairments that his RFC was reduced to "light."  (Id.).

On May 26, 2009, Dr. Sandra Eames reviewed and affirmed Dr. Salmi's assessment.  (Tr. 460-462).  Dr. Eames noted that "[Henningsen] alleged ongoing pain in back and neck, ADD and learning disability," but that per the medical notes, his pain was gradually improving and he was able to ride his 4-wheeler around his yard, drive and go shopping.  (Tr. 461).

### 2.    Psychiatric Assessment

State Agency reviewing psychologist Dr. Owen Nelsen reviewed Henningsen's records from August 30, 2008 to March 13, 2009, and concluded that his impairments were not severe.  (Tr. 420-432).  The Psychiatric Review Technique form Dr. Nelsen completed contained a listing of all mental health disorders to be considered in rendering his opinion, including 12.07, Somatoform Disorders.  (Tr. 426).  Dr. Nelsen

checked 12.04, Affective Disorders, and 12.06, Anxiety Disorders, but not 12.07, Somatoform Disorders. (Tr. 420, 426). Dr. Nelsen noted Henningsen's history of depression and anxiety, but indicated that these conditions did not precisely satisfy the diagnostic criteria described on the Psychiatric Review Technique form. (Tr. 423, 425). Dr. Nelsen determined that Henningsen had "mild" restrictions of activities of daily living, "mild" difficulties in maintaining social functioning, "mild" difficulty in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 430)

In support for these determinations, Dr. Nelsen indicated that Henningsen had a history of depression, but no current treatment. (Tr. 432). When Henningsen was seen for an assessment before his gastric bypass surgery, he was found to have a possible anxiety disorder, focused on his financial situation and the possible foreclosure proceedings on his house. (Tr. 432). It was suggested that he have some mental health treatment before his surgery. (Id.). Dr. Nelsen noted the assessment "showed 'very happy' mood, appropriate affect, logical thought process, recent and remote memory were intact." (Id.). Regarding activities of daily living, Dr. Nelsen indicated that while Henningsen was limited by his physical impairments, he got assistance from his wife for personal cares (e.g. hair care and shaving); he prepared simple meals; he helped care for his dogs; he mowed the lawn as his physical impairments allowed him to do; he went outside twice a week; and he shopped once a week. (Id.). Dr. Nelsen concluded that Henningsen's mental allegations were non-severe. (Id.).

Following Dr. Nelsen's assessment, state agency consultant, Dr. Russell Ludeke, reviewed the evidence and on May 26, 2009, affirmed Dr. Nelsen's assessment. (Tr. 457-459). Dr. Ludeke noted that Henningsen's claimed inability to work was due to physical impairments, not mental. (Tr. 458).

24

## VI. HEARING TESTIMONY

At the hearing before the ALJ on May 12, 2010, Henningsen testified that he was fired from his full time construction job (during the summer) and logging (during the winter) in 2004 because he was attending too many doctor's appointments. (Tr. 999, 1001). Henningsen reported that he had hip and back pain and that he "lived" in a recliner. (Tr. 1002). Henningsen stated that he had been treated with steroid injunction for his lower back pain for three years, which helped with pain while he was in his recliner, but that his pain would flare up when he tried to do anything. (Tr. 1004).

Henningsen described a typical day as follows. He woke up early because his wife was up, but he would fall back asleep until 10:00 or 11:00 a.m. (Tr. 1005). Henningsen denied doing any household chores, cooking, laundry or dishes. (Tr. 1005-1006). Henningsen reported taking two Percocet, 20 mg. of Oxycontin and 10 mg. of Valium to sleep at night, as well as 50 mg. of Seroquel and a Baclofen.[8] In the morning, Henningsen took Percocet, OxyContin, a Baclofen and medication for his depression. (Tr. 1007). On a bad day, he would take a Valium during the day. (Id.).

Henningsen told the ALJ that he could sit comfortably in an upright chair for two hours at a time, "max," and that standing was more painful than sitting. (Tr. 1008). Henningsen filled his time during the day by watching television, although he testified that he drove himself to his medical appointments. (Tr. 1009). Additionally, he was able to bow hunt twice during the previous hunting season for limited periods of time. (Tr. 1009-1010).

---

[8] Baclofen is used to relieve pain and improve muscle movement. www.nlm.nih.gov.

As a result of complications following his gastric bypass surgery, Henningsen was hospitalized for eighteen days in May, 2009. (Tr. 1011). Henningsen was placed on blood thinners and continued to have his blood drawn once a week, although occasionally he was able to skip a week of blood work. (Tr. 1012).

Henningsen testified that the last time he used methamphetamine was five years ago, he was "very active" in NA and AA, and he spoke at Dellwood Recovery in Mora (Minnesota). In addition to the pain medications, Henningsen was taking Celexa for depression and he told the ALJ that his depression was "definitely" stable. (Tr. 22).

Henningsen's mother, Joan, testified that Henningsen "absolutely" could not work. (Tr. 1019). She described Henningsen's poor financial condition and her attempts to help by buying groceries and paying the phone bills. (Id.). She reported that while in the past Henningsen had been able to maintain his home, he was no longer able to do so. (Tr. 1020). Mrs. Henningsen testified that Henningsen had stopped logging in 2002 because it was too hard on his back. (Id.). Henningsen took a summertime job, but after being fired, he believed that being unemployed for a period of time would aid him in taking care of his body and that he would be able to find employment the following spring. (Tr. 1021). However, his health declined. (Id.).

The ALJ asked the VE to assume a forty-year old individual with an eleventh-grade education and Henningsen's prior work history, who could lift twenty pounds occasionally and ten frequently, stand and sit six hours in an eight-hour workday, could not climb ladders, but who could occasionally climb stairs, balance, stoop, kneel, crouch and crawl, and who could only occasionally be exposed to humidity and wet.[9] (Tr. 1022-23). The VE testified that an individual in those circumstances could not

---

[9]    Henningsen testified that his hip and leg "flared up" when it rained. (Tr.1022-23).

perform past work. (Tr. 1023). The VE testified that such an individual could perform light janitorial work or light "packager" work—two positions consistent with the Dictionary of Occupational Titles ("DOT"). (Id.).

The ALJ then changed the hypothetical, asking the VE to assume an individual who could lift ten pounds occasionally and five frequently, stand for two hours in an eight-hour work day and sit for six hours, but who had to have a sit-stand option after thirty minutes, with the non-exertional limitations remaining the same. The VE testified that such an individual could perform the jobs of sedentary unskilled assembler and sedentary unskilled packager—jobs that were also consistent with the DOT. (Tr. 1024).

Henningsen's attorney asked the VE whether an individual limited to sedentary work with a sit-stand option, but who also had to be absent from work at least five hours a month for doctors' appointments, could maintain employment. (Tr. 1025-1027). The VE testified that such absences were consistent with the unskilled employment she had testified the individual could perform. (Tr. 1027-28).

## VII. THIRD PARTY FUNCTION REPORTS

On February 2, 2009, Henningsen's wife, Bridget Henningsen, submitted a Third Party Function report in connection with Henningsen's application for benefits. (Tr. 236-243). Mrs. Henningsen stated that Henningsen let their dogs out twice a day, but that she was primarily responsible for their care. (Tr. 237). Before Henningsen became disabled, he was able to do "everything," such as working, making dinner, doing yard work and gardening, fishing, hunting and 4-wheeling. (Id.). After he became disabled, he could no longer stand at the stove to cook and Mrs. Henningsen had to help him with his personal care. (Id.). Mrs. Henningsen reported that Henningsen could mow the lawn on the riding lawn mower for thirty minutes at a time, but that he had to take an

hour-long break every thirty minutes. (Tr. 238). Additionally, he did some shopping approximately three times a month. (Tr. 239). She also reported that Henningsen only went outside once or twice a week because it was difficult for him to get out of his recliner due to his pain. (Id.). As for his social activities, Mrs. Henningsen stated that Henningsen attended a one-hour meeting on Monday and Tuesday nights.[10] (Tr. 240). Mrs. Henningsen also noted that Henningsen had trouble concentrating, following instructions and that he did not handle stress well. (Tr. 241-242).

Mrs. Henningsen stated that they were formerly a very active couple, but that because of Henningsen's pain they stayed home all the time and had lost touch with many of their friends. (Tr. 243).

On April 9, 2009, Henningsen's mother also submitted a Third Party Function Report. (Tr. 244-258). Henningsen's mother stated that Henningsen had difficulty standing, walking caused him pain, and he had become socially isolated as a result of his pain and inability to be active. (Tr. 248). According to his mother, Henningsen's wife did all of the cooking, took care of the finances, fed and provided water for their dogs, and has essentially been "doing everything" since July, 2004. (Tr. 245, 246).

VIII.    DISCUSSION

    A.    The ALJ's Duty to Develop the Record

In a disability case, the plaintiff has the burden of proving that his or her conditions meet or equal a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)). A listing is met when an impairment meets all of the listing's specified criteria. Id. (citing Sullivan, 493 U.S. at

---

[10]    The Court assumes Mrs. Henningsen is referring to AA and NA meetings.

530 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.")

To meet Listing 12.07, the "paragraph A" criteria (a set of medical findings) and "paragraph B" criteria (a set of impairment-related functional limitations), must be met. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A).  In addition, if the "paragraph B" criteria are not met, then a determination must be made as to whether "the paragraph C" criteria are met.[11]  Id.  In other words, the paragraph C criteria are only addressed if first, the "paragraph A" criteria are met and the paragraph B criteria are not satisfied.  Id. ("We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.").

---

[11]    To satisfy the C criteria of Listing 12.04, the claimant must show:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1.  Repeated episodes of decompensation, each of extended duration; or
>
> 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

Before an ALJ must consider whether a mental impairment meets or equals a listed impairment, there must first be a medically determinable mental impairment garnered from medical evidence from an acceptable medical source. See Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992) ("The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520(a). The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. Id. § 404.1520(a)(b)(1). These are gleaned from a mental status exam or psychiatric history, id., and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. See id. § 404.1508) (emphasis added); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A) ("Introduction. The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), . . . Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings.") (emphasis added); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(B) ("Need for medical evidence. We must establish the existence of a medically determinable impairment(s) of the required duration by medical evidence consisting of symptoms, signs, and laboratory findings (including psychological test finding") (emphasis added); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D) ("Documentation. The evaluation of disability on the basis of a mental disorder requires sufficient evidence to (1) establish the presence of a medically determinable mental impairment(s) . . . ") (emphasis added); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(1)(a) ("Medical Evidence. There must be evidence from an acceptable medical source showing that you have a mental impairment.") (emphasis added).

Similarly, "[t]o establish equivalency, a claimant 'must present <u>medical findings</u> equal in severity to all the criteria for the one most similar listed impairment.'" <u>Carlson v. Astrue</u>, 604 F.3d 589, 593, 594 (8th Cir. 2010) (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 531, (1990) (emphasis added); <u>see</u> <u>also</u>, <u>Sullivan</u>, 493 U.S. at 531, 110 S.Ct. 885 ("a claimant ... must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment") (emphasis in original).

In short, before the ALJ can make a finding that an impairment or combination of impairments meets or equals a Listing, there must first be medical evidence establishing a medically determinable mental impairment.

"The ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004) (citations omitted). This is because an administrative hearing is a non-adversarial proceeding; consequently, the ALJ must develop the record fully and fairly so that "'deserving claimants who apply for benefits receive justice.'" <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1138 (8th Cir. 1998) (quoting <u>Battles v. Shalala</u>, 36 F.3d 43, 44 (8th Cir.1994). Moreover, because "[t]he ALJ possesses no interest in denying benefits and must act neutrally in developing the record," the ALJ's duty to develop the record exists even when the claimant is represented by counsel at the administrative hearing. <u>Snead</u>, 360 F.3d at 838.

When a plaintiff has alleged that the ALJ failed to properly develop the record, the proper inquiry is whether the record contained sufficient evidence for fair determination. <u>George v. Astrue</u>, 301 Fed. Appx. 581, 582–83 (8th Cir. 2008).

An ALJ's duty to develop the record is not unqualified, and does not relieve the claimant from identifying the issue or issues requiring further development. <u>Wall v.</u>

Astrue, 561 F.3d 1048, 1062-1063 (10th Cir. 2009).  Further, where a claimant is represented by counsel, the ALJ "should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored."  Duncan v. Astrue, Civ. No. 08-2144, 2009 WL 1254737 at * 5 (D. Kan. May 5, 2009) (citing Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997)). The ALJ has a duty to develop the record during a disability hearing consistent with the issues raised.  Id. (citation omitted).

"Where the ALJ fails to fully develop the record, this court may remand for the taking of further evidence."  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002), (citing Payton v. Shalala, 25 F.3d 684, 686 (8th Cir. 1994). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) (citing Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir.1993).

Henningsen's argument that the ALJ should have obtained medical expert testimony regarding whether his impairments met or equaled Listing § 12.07 (Somatoform Disorders) is meritless.  See Yancey v. Apfel, 145 F.3d 106, 114 (2nd Cir. 1998) ("20 CFR § 404.1512 explicitly places the burden of supplying all relevant medical evidence on the claimant.  . . . The only indication of a "mental impairment" was Yancey's testimony that one doctor allegedly informed her that her problems were "in her head."  Notably the physicians of record neither suggested the existence of a mental impairment nor recommended that Yancey undergo a psychological or psychiatric evaluation.").  At the third step of the sequential analysis, the ALJ is responsible for deciding the ultimate legal question whether a listing is met or equaled.  SSR 96-6P, 1996 WL 374180 at *3.  Such a determination must be based on medical evidence in

the record. The ALJ is only required to obtain medical expert testimony when the record is inconclusive as to whether the claimant's impairments meet or are equal to a listing, or if additional medical evidence is received that in the opinion of the ALJ may change the State agency medical consultant's finding that the impairment do not meet a Listing or are not equivalent in severity to a Listing. See e.g., SSR 96-6P, 1996 WL 374180 at *3-4 ("[A]n administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances: *When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or *When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.") (footnote omitted); see also, Simon v. Astrue, Civ. No. 09-5523, 2010 WL 4269607 at *3 (E.D. Pa., Oct. 28, 2010) ("At the third step of the sequential analysis, an ALJ is only obligated to obtain ME testimony when the record is inconclusive as to whether the claimant's impairments are equal to a listing.") (citing Diehl v. Barnhart, 357 F.Supp.2d 804, 815 (E.D.Pa.2005); S.S.R. 96–6p)).

Here, there was no reason for the ALJ to obtain additional medical evidence to address whether Henningsen's mental impairments met or equaled Listing 12.07 for the simple reason that there was no medical evidence in the record supporting a medically determinable somatoform disorder, much less alerting the ALJ that Henningsen might be suffering from a somatoform disorder. See Burns v. Sullivan, 888 F.2d 1218, 1219 (8th Cir. 1989) ("The medical and psychological evidence before the ALJ does not

support a finding of somatoform disorder. The psychological evaluations diagnosed situational depression, or anxiety, but these diagnoses do not fall within the definition of somatoform disorder") (citing <u>Brown v. Bowen</u>, 864 F.3d 336, 339 (5th Cir. 1988) (where psychologist did not diagnose somatoform disorder, but diagnosed other psychological problems, ALJ finding of not disabled supported by record)).

First, the Psychiatric Review Technique assessments prepared by Dr. Nelsen and Dr. Ludeke did not address Listing § 12.07.  The only Listings substantively addressed in the form were Listing 12.04 (Affective Disorder), in which Dr. Nelsen indicated "Depression by history," and Listing 12.06 (Anxiety Disorder), in which he stated "Possible Anxiety Disorder."  (Tr. 423, 425).  No symptoms were noted in connection with either Listing.  (<u>Id.</u>)  Dr. Nelsen then analyzed the "paragraph B" criteria applicable to both Listings 12.04 and 12.06 (which are the same as the "paragraph B" criteria for Listing 12.07), and found that Henningsen had only "mild" restrictions of activities of daily living, "mild" difficulties in maintaining social functioning, "mild" difficulty in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 430).  In support for these determinations, Nelsen referenced Henningsen's history of depression and a possible anxiety disorder as noted in the medical records.  (Tr. 432).  Dr. Ludeke affirmed Dr. Nelsen's assessment.  (Tr. 457-459).  Consequently, even if Dr. Nelsen had any reason to consider Listing 12.07 (which, of course, he did not, as there was no medical evidence in the record to suggest that Henningsen suffered from a somatoform disorder), based on his determination that Henningsen did not meet the "paragraph B" criteria, there was no medical basis to find that Henningsen met Listing 12.07.

Second, there are <u>no</u> records, medical or otherwise, to support, much less suggest, that Henningsen was suffering from a somatoform disorder. Consequently, Henningsen's argument that the record "is clear" that he met the "paragraph A" criteria of the Listing 12.07 (unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury), is baseless. In fact, there is no evidence to corroborate Henningsen's statement that he is "preoccupied" with his back pain. Further, although Henningsen asserted that "the evidence overwhelmingly supports the fact that his pain was disproportionate to a diagnosis of lumbago," he cited no such evidence and this Court could divine no such evidence from the record. For example, the MMPI-2 cited by Henningsen made no mention of any symptom of any such condition. Moreover, the medical evidence indicated the opposite of a somatoform disorder – the records reflected that Henningsen <u>has</u> a degenerative disc disorder for which he experiences back pain and it was responding to medication and steroid injections. (Tr. 370, 381, 405-17, 415-416, 418-419, 475, 485, 497, 632-36, 640, 650, 666, 700, 742). Indeed, the ALJ acknowledged Henningsen's back problems in finding that his degenerative disc disorder was a "severe impairment."

Third, neither Henningsen nor his attorney ever argued at the administrative hearing that Henningsen was suffering from a somatoform disorder. Henningsen and his attorney had before them a substantial medical record, none of which mentioned a somatoform disorder (or even the symptoms of such a disorder) and Psychiatric Review Technique Forms that specifically listed somatoform disorders. To the extent Henningsen believed that he was suffering from such a disorder, at a minimum it was incumbent on him to inform the ALJ, if not come forward with evidence the claim. The

ALJ cannot be faulted for failing to specifically inquire about some condition that no one had ever raised or opined about.  As the court observed in <u>Duff v. Astrue</u>,

> While it is indeed true that the ALJ did not do any analysis as to whether plaintiff's impairments met the 12.07 somatoform listing, the absence of such an analysis reflects no failing on the ALJ's part, as the issue of Listing 12.07 or a somatoform disorder was not raised during the administrative proceeding, nor is there evidence in the record to suggest the existence of a somatoform disorder. Plaintiff Duff, having failed to raise the issue during the administrative proceedings as to whether his impairments met or equaled the 12.07 somatoform listing, cannot raise the issue for the first time on appeal to the district court. <u>Huckabee v. Richardson</u>, 468 F.2d 1380, 1381 (4th Cir.1972) ("Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence.").

Civ. No. 5:11-103, 2013 WL 443770 at *1 (W.D. VA. Feb. 5, 2013).

In light of the dearth of medical evidence that Henningsen was suffering from a somatoform disorder and Henningsen's failure to raise it at the hearing, at any time prior to the decision of the ALJ, or on appeal to the Appeals Council, this Court cannot find that the ALJ shirked his duty to inquire or develop the record about an unnamed and unknown condition.  <u>See</u> <u>Glass v. Shalala</u>, 43 F.3d 1392, 1396 (10th Cir. 1994) (an ALJ's duty of inquiry is not "a panacea for claimants" requiring "reversal in any matter where the ALJ failed to exhaust every potential line of questioning.").

For all of these reasons, the Court rejects Henningsen's contention that the ALJ failed to properly develop the record.

## B.      The "B" Criteria for Listing 12.07

In light of the lack of evidence that Henningsen met the "paragraph A" criteria of Listing § 12.07 (a set of medical findings), it is unnecessary for this Court to dwell at any length on whether there was substantial evidence in the record to show that he met any

of the requirements of the "paragraph B" criteria of the Listing. Suffice it to say, as discussed above, based on his review of the records through March 2009, Dr. Nelsen concluded that Henningsen met none of the "paragraph B" criteria, and Dr. Ludeke affirmed these findings in May 2009. Further, notwithstanding Henningsen's statements about "living" in his recliner, there was ample evidence in the record to the contrary and to support the ALJ's finding that Henningsen did not meet any of "paragraph B" criteria. (Tr. 13-14). For example, with respect to his activities of daily living and social functioning, the record reflected that Henningsen was walking several times a week; he kept busy by doing work for himself and his wife around their property; he assisted his parents with their home and property; he attended medical appointments; he shopped; he took care of the dogs; he mowed the lawn; he went bow hunting; and he attended and spoke regularly at AA and NA. (Tr. 247, 369, 370, 415, 417, 418, 485, 717, 1009-1010). In addition, Henningsen got along with family members, neighbors and authority figures. (Tr. 249, 250). Finally, none of Henningsen's providers opined on Henningsen's ability to engage activities of daily living, or placed limitations on his social functioning, or concentration, pace or persistence

Henningsen's assertion that he met the "paragraph B" criteria finds no support in the record.

## C.     The ALJ's Hypothetical Questions to the VE

Henningsen argued that the ALJ should have included in his hypothetical questions to the VE a description of specific limitations consistent with Henningsen's depression and pain. Pl. Mem., p. 20. The ALJ's hypothetical included all of the limitations described in Dr. Salmi's RFC assessment (Tr. 434-441) and affirmed by Dr. Eames (Tr. 460-462). The ALJ was entitled to include only those impairments in his

hypotheticals that he considered to be supported by the record. George, 301 Fed. Appx. at 582 (citing Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (ALJ may exclude alleged impairments he has properly rejected as untrue or unsubstantiated)).

The ALJ indicated that he considered Henningsen's significant pain level in determining his RFC, (Tr. 14), and stated that to address his chronic pain, he included in the RFC weight lifting restrictions, as well as limitations on balancing, stooping, kneeling, crouching and crawling. (Tr. 15). On the other hand, after reviewing the medical evidence, the ALJ concluded that while Henningsen's medically determinable impairments could reasonably cause his symptoms, Henningsen's testimony regarding the intensity, persistence and limiting effects of the symptoms was not consistent with the RFC assessments. (Tr. 16).

"'An ALJ may not discount a claimant's allegation of disabling pain solely because the objective medical evidence does not fully support' the allegations." Olson v. Astrue, Civ. No. 11-3491, 2012 WL 6861346 at *15 (D. Minn. Dec. 19, 2012) (quoting Goff, 421 F.3d at 792). In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)). The Polaski factors require the ALJ to fully consider all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;
2. the duration, frequency, and intensity of the pain;
3. precipitating and aggravating factors;
4. dosage, effectiveness, and side effects of medication; and
5. functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Cox, 160 F.3d at 1207. The ALJ may consider whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of Plaintiff's subjective complaints. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993.)) For example, the ALJ may find a claimant's subjective complaints inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 1207. If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).

"It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Id. But the failure to address each of the Polaski factors separately does not render the ALJ's determination invalid. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination, she did so implicitly by evaluating the claimant's testimony under the Polaski factors and by identifying inconsistencies

between the claimant's statements and evidence in the record); <u>see</u> <u>also</u> <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each <u>Polaski</u> consideration, so long as he acknowledged and examined those considerations).

In this case, the ALJ noted Henningsen's allegation that he spent the majority of his life in a recliner and that driving was especially difficult for him. (Tr. 15, citing Tr. 781). However, the ALJ found those statements inconsistent with evidence that Henningsen made the eighteen-mile trip to the doctor despite his pain. (Tr. 15). Further, the ALJ found Dr. Niskanen's statement that Henningsen was limited in his ability to perform daily activities to be inconsistent with Henningsen's actual level of physical activity. (Tr. 16). In support, the ALJ referenced Henningsen's ability to keep busy doing things on his property, keep active with his dogs, work at his house and his parents' house, and shop. (Tr. 15). As discussed above, the record confirms the ALJ's analysis. (Tr. 247, 369, 370, 415, 417, 418, 485, 717, 1009-1010). The record also substantiates the ALJ's analysis of Henningsen's prescription drug use and the ALJ's conclusion that there was no evidence that the medications did not provide Henningsen with significant relief from his symptoms. (Tr. 16, citing Tr. 381, 383, 384, 389, 547).

Finally, the ALJ considered Henningsen's mother's statement regarding Henningsen's severe and disabling level of pain. (Tr. 16, citing Tr. 244-258). The ALJ did not give as much weight to this statement, noting that her relationship to Henningsen provided an incentive to make statements in support of his application. <u>See</u> <u>Greger v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006) (a lay witness's testimony close relationship with and desire to help a claimant can be a basis for rejecting lay testimony). Similarly, the ALJ properly declined to place much weight to on the

statement made by Hintz, a psychologist, that Henningsen was "disabled," because she was not qualified to render such an opinion. (Tr. 15, citing Tr. 416). <u>See</u> <u>Buxton v. Halter</u>, 246 F.3d 762, 775 (6th Cir. 2001) (noting that a psychologist "was not qualified to diagnose" "underlying *physical* conditions.") (emphasis in original)

In sum, the ALJ properly considered all of the evidence bearing on Henningsen's impairments and his subjective complaints of pain, and included in his hypotheticals to the VE only those limitations that were substantiated by the record. This Court finds no error in the manner in which the ALJ presented the hypotheticals to the VE.

## IX. CONCLUSION

It was Henningsen's burden to prove that he met or medically equaled a listed impairment. Not only did Henningsen provide no evidence that he met or equaled Listing § 12.07, but the evidence was unequivocal that he did not even meet the threshold criteria of the listing. Additionally, this Court concludes that there was substantial evidence in the record to support the ALJ's determination that Henningsen was not disabled and the ALJ committed no error in either developing the record or in the hypothetical questions he posed to the VE.

**X.    RECOMMENDATION**

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 15] be **DENIED**; and

2.      Defendant's Motion for Summary Judgment [Docket No. 19] be **GRANTED**.

Dated:        February 13, 2013

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United State Magistrate Judge


**NOTICE**

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 27, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.